IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America    )
                          )
      Plaintiff,     )
                          )
                          )
      v.               )   No. 17 CR 442
                          )
Steven Miller,        )
                          )
      Defendant.     )

Memorandum Opinion and Order

In May of 2019, I sentenced defendant Steven Miller on his guilty plea to one count of mortgage fraud. The sentence included a restitution order requiring Miller to pay approximately $1.1 million to the victims of his fraud. Days after Miller's sentencing, Miller's wife, Liliya Krasilnikova, entered into a contract to sell the home that she shared with Miller, their two children, and, sometimes, Miller's two sons from a previous marriage, *see* Presentence Investigation Report at ¶¶ 53, 57, DN 127 (the "Crescent Avenue Property") for $855,000. The sale closed in the ensuing months, and the government claims a portion of the proceeds—which by agreement have been held in escrow since the sale—to satisfy part of Miller's restitution obligation.[1]

---

[1] Pursuant to the parties' further agreement, on February 22, 2021, I authorized the escrow agent, Old Republic National Title Insurance Company to issue to Ms. Krasilnikova a check for 50% of the escrowed

Although not formally a party to these proceedings,[2] Ms. Krasilnikova seeks the release of the escrowed funds to her, arguing that she alone owned the property and is entitled to the entirety of the 2019 sale proceeds. For the reasons explained below, I conclude that although Krasilnikova indeed held title to the Crescent Avenue Property, the home was in fact marital property in which Miller held a presumptive one-half interest. And because the evidence of record is insufficient to warrant a departure from this presumption in favor of either party, the government is entitled to one half of the sale proceeds.

I.

"An order for payment of restitution becomes a lien on all property and rights to property of the defendant upon entry of judgment." *United States v. Kollintzas*, 501 F.3d 796, 802 (7th Cir. 2007). Because "liens to pay restitution debts are treated like tax liens," they are "'effective against every interest in property accorded a taxpayer by state law,'" *id.* (quoting *United States v. Denlinger*, 982 F.2d 233, 235 (7th Cir. 1992)). This includes property co-owned with another, "to the extent allowed by the law of the State where the property is located." *Id.* at 801 (quoting 28 U.S.C. § 3010(a)). I look to state law to determine Miller's rights

---

funds. The present dispute concerns the remainder of the funds in escrow. Neither party has quantified the specific amount at issue.
[2] For ease of reference in this opinion, I refer to Ms. Krasilnikova and the government as "the parties," and to defendant Miller—who is in fact the named party—as "Miller."

in the property the government seeks to reach, then to federal law to determine whether those rights "qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *United States v. Henricks*, 886 F.3d 618, 625 (7th Cir. 2018).

The parties' dispute begins with threshold disagreements over the analytical framework that applies to their competing claims and which party bears the burden of proof as to ownership. The government invokes the framework of civil collection actions pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C.A. §§ 3010(a), 3202(c), under which Ms. Krasilnikova is an "interested person" who claims a competing right to property over which the government asserts a valid lien. In the government's view, this means that Ms. Krasilnikova bears the burden of proving that her interest in the Crescent Avenue Property is exclusive to any interest that Miller—and thus the government—has in the property.

By Ms. Krasilnikova's lights, however, the government's claim is, in substance, an action to quiet title that it asserts pursuant to the terms of the parties' escrow agreement. In that agreement, whose objective was to facilitate the sale of the Crescent Avenue Property to a third party, the parties acknowledged their competing claims to the equity in the property, and the government agreed to discharge its lien on the property, provided the sale proceeds be held in escrow pending resolution of the parties' competing claims.

3

The agreement further stated that the parties would "endeavor to resolve their competing claims," but if they could not do so, they would "submit the matter" to this court "for a final decision." In Ms. Krasilnikova's framing of the government's cross-motion for turnover of the escrowed funds, the government implicitly seeks an adjudication of title in its favor. Accordingly, she reasons, the government bears the burden of proving Miller's ownership interest. Mot. to Clarify Burden, at 3.

Ms. Krasilnikova's argument is misguided on several fronts. As an initial matter, the government's claim cannot reasonably be characterized as an action to quiet title, which is "an equitable proceeding in which a party seeks to remove a cloud on his title to the property." *Gambino v. Boulevard Mortg. Corp.*, 398 Ill. App. 3d 21, 52, 922 N.E.2d 380, 410 (2009). Such actions are available only to the holder of title, *id.*, and no one contends that Miller held title to the Crescent Avenue Property, much less that Krasilnikova's interest in their marital home "clouds" his title interest. In fact, if either party's claim can properly be characterized as an action to quiet title, it is Krasilnikova's, as it is she who claims that her interest as title holder is exclusive to any property interest Miller may have. Indeed, in her pre-hearing memorandum, she refers to the government's lien as a "cloud upon the title." DN 180 at 2. Accordingly, her effort to reframe the action in this manner does

4

not advance her argument that the government bears the burden of proof.

Nor is there merit to Ms. Krasilnikova's suggestion that the government's action arises under the parties' escrow agreement. First, that agreement does not grant the government any substantive right to the proceeds of the sale of the Crescent Property, which flow instead from the restitution order. *See Kollintzas*, at 802 (7th Cir. 2007). The escrow agreement also does not offer any self-standing procedural vehicle for the government to assert its rights. "In general, the Federal Debt Collection Procedures Act "provides the exclusive civil procedures for the United States ... to recover a judgment on a debt." *United States v. Sheth*, 759 F.3d 711, 716 (7th Cir. 2014). In short, the government's claim neither arises nor proceeds under the escrow agreement, which merely set the terms by which the government agreed to release its lien as to the disputed property, and the parties agreed to submit their dispute to this court in the event they were unable to resolve their claims amicably.

It is true, as Ms. Krasilnikova notes, that the government neither sought a writ of garnishment nor served her with notice of garnishment proceedings as provided by § 3202(b) of the FDCPA. But she does not claim to have been prejudiced by the government's failure to take these procedural steps, nor does she offer any authority to suggest that their omission invalidates the

proceedings *per se*. As the record reflects, Ms. Krasilnikova had actual notice of the government's claim and has participated actively in these proceedings with the assistance of an attorney and has availed herself of the opportunity to present both documentary and testimonial evidence in support of her claims. Accordingly, notwithstanding any procedural irregularities in the government's collection effort, I conclude that its claim is, in substance if not perfect form, an action "to recover a judgment on a debt" governed by the FDCPA, and that Ms. Krasilnikova may properly be treated as an "interested person" who bears the burden of proving her claim to the disputed property. *See United States v. Meux*, 597 F.3d 835, 838 (7th Cir. 2010) (claimant not prejudiced by government's failure to institute garnishment proceedings because he was "provided with essentially the same due process protections he would have been accorded in garnishment proceedings," including an attorney and a hearing on the government's motion for turnover); *Kollintzas*, 501 F.3d at 803 ("interested person" was required "to establish her interest in the property sought to be garnished...in the district court.").

This is not to say that the government bears no burden at all. All agree that when the Crescent Avenue Property was sold in August of 2019, Ms. Krasilnikova alone held the deed to the property, and she appears to have transferred a facially unencumbered title. Under these circumstances, it makes sense that the government be required

6

to present *some* evidence that Miller, while not a titled owner of the property, had a de facto interest in it as a co-owner. But as discussed below, the record includes ample evidence that both Miller and Krasilnikova treated the Crescent Avenue Property as marital property, and that Miller not only lived in the property but also exercised the sort of dominion and control over the it that is consistent with ownership. In fact, Ms. Krasilnikova herself appears to have had little involvement in the initial purchase of the property or in the series of title transfers and loan transactions it underwent over the years.

II.

Ms. Krasilnikova holds a bachelor's degree in business administration and finance and a master's degree in accounting, and she has several years of professional experience in the mortgage industry. Hr'g. Tr. at 6. Prior to her marriage to Miller, she worked for Miller's mortgage company as a loan officer and processor. *Id*. at 5-6. More recently, she has worked in the banking industry performing risk analysis of banks' financial portfolios. *Id*. at 8-9. She testified that throughout her career, she has reviewed "a lot" of property title documents and has bought several residential properties of her own in the Chicago are. *Id*. at 13, 31.

In February of 2012, when Ms. Krasilnikova was Miller's fiancée, she paid $250,000 in funds her parents gave her to purchase

7

the Crescent Avenue Property. Hr'g. Tr. at 14, 53-54, 71. Although Ms. Krasilnikova funded the purchase, she did not obtain title to the property. Instead, title passed to a land trust, State Bank of Countryside Trust #08-3-42 (the "Countryside Trust"), of which Ms. Krasilnikova and Ellen Malecki, a longtime friend of Miller's, were the beneficiaries. Gov't. Exh. 6; Hr'g. Tr. at 11-12, 89-90. Ms. Krasilnikova did not attend the closing for the purchase of the Crescent Avenue Property, having authorized Miller to handle the transaction. Hr'g. Tr. at 16-17. She did not know why Ms. Malecki was also a beneficiary of the Countryside Trust, and she considered herself to be the owner of the Crescent Avenue Property, even though the title to it was held by the trust. *Id*. at 16. When asked at the evidentiary hearing whether that meant that Ellen Malecki also owned the property, she responded, "I guess that's how it came out." *Id*. 16. At the time she funded the purchase of the Crescent Avenue Property, Ms. Krasilnikova was in default on a mortgage loan she held on another property in Hazel Crest, Illinois, which she ultimately lost in foreclosure. *Id*. at 35-36.

In December of 2012, Ms. Krasilnikova and Miller were married. On December 11, 2012, the City of Park Ridge issued a construction permit to raze and rebuild the house on the Crescent Avenue Property in a project estimated to cost $425,000. Gov't Exh. 10.

The following March, the Countryside Trust took out a mortgage loan in the amount of $200,000 from SRK Ventures, LLC. *See* Gov't.

8

Tr. Exh. 8. Steve Miller was the individual designated to receive notice to the borrower under the terms of the SRK loan, *id.* at 30, and Miller also guaranteed the loan pursuant to a separate Guaranty of Payment and Performance. Gov't. Exh. 9. Ms. Krasilnikova testified that she did not know why Miller guarantied the loan, and that she herself "was also a guarantor," Hr'g. Tr. at 85, but she points to no evidence of any guaranty but Miller's with respect to the SRK loan. Although the SRK loan bears Ms. Krasilnikova's signature and a signature purporting to be Ellen Malecki's, Ms. Malecki testified that her signature is a forgery and that she had no knowledge of the loan.

Ms. Krasilnikova testified that she paid off the SRK loan with $250,000 she borrowed from a friend named Thomas Wake, whom she met through Miller. The loan from Wake was not memorialized in any documents. H'rg. Tr. at 47. According to Ms. Krasilnikova, Mr. Wake was paid back directly with funds from the "Caliber" loan—another mortgage loan secured by the Crescent Avenue Property, discussed below. H'rg. Tr. at 46-49.

In September of 2013, Miller and Ms. Krasilnikova moved into the Crescent Avenue Property, where they continued to live as a family after the birth of their two children. On or around November 14, 2013, Ms. Krasilnikova transferred all of her interest in the Countryside Trust—still the titled owner of the Crescent Avenue Property—to Ellen Malecki and her husband, Gary Malecki. Gov't.

Exh. 14. The following week, the Countryside Trust deeded the Crescent Avenue Property to Gary and Ellen Malecki. Gov't Exh. 16.

The deed to the Crescent Avenue Property remained in the Maleckis' names for the next two years. On December 27, 2013, Carrington Mortgage Services issued a mortgage loan secured by the property to Gary and Ellen Malecki as borrowers. Gov't. Exh. 18. Ms. Krasilnikova testified that Miller told her that Ellen had agreed to finance the property to "help [her] out" because Krasilnikova's credit score was not high enough to obtain a loan in her own name. Hr'g. Tr. at 21. Ellen Malecki testified, however, that she did not know the deed to the Crescent Avenue Property had been transferred to her and her husband's names; that she had never seen the Carrington Mortgage documents or received the loan proceeds; and that the signatures purporting to be hers and her husband's on these documents were forgeries. Miller witnessed and notarized the forged loan application. Hr'g Tr. at 96-97, 100; Gov't. Exh. 17 at 13-14. In February of 2014, servicing of the Carrington mortgage was transferred to Caliber Home Loans. Gov't Exh. 19.

Throughout the life of the Carrington/Caliber mortgage, Ms. Krasilnikova made monthly payments on the loan from the joint checking account she shared with Miller, into which both spouses' paychecks were deposited. Hr'g. Tr. at 26-27. According to Ms. Krasilnikova, the proceeds of this loan were used to pay back

10

various individuals, including Thomas Wake. *Id.* at 46-49. She acknowledged, however, that the HUD-1 settlement statement for the Caliber loan—which she had never seen—did not show payment to Mr. Wake or any individual other than the "borrowers," identified as Gary and Ellen Malecki. *Id.* at 79-80; Gov't Exh. 35. Mr. Krasilnikova stated that she did not receive the loan proceeds herself and had "no idea" what happened to the funds. *Id.*; Gov't Exh. 35.

On September 22, 2015, the Crescent Avenue Property was quit claimed by the Maleckis to Myers Building & Consulting. Gov't Exh. 21. Ellen Malecki testified that her signature on the quit claim deed, which Miller notarized, was forged. Hr'g. Tr. at 101. Days later, Myers Building & Consulting quit claimed the property to Ms. Krasilnikova. Gov't. Exh. 22. Ms. Krasilnikova testified that her signature on the quit claim deed, which Miller notarized, was forged. Hr'g Tr. at 66. These irregularities notwithstanding, the September 30, 2015, quit claim deed conveying the Crescent Avenue Property to Ms. Krasilnikova marks the moment at which she first became the property's title holder.

Just two days later, First Generation Capital, Inc., issued yet another mortgage loan secured by the Crescent Avenue Property. This loan, for $310,000, identified Gary and Ellen Malecki as the Mortgagors and an entity called "OV18 LLC" as the Borrower. Ms. Krasilnikova testified that OV18 LLC was one of Miller's companies.

11

Hr'g Tr. at 30. Although the title documents indicate, as noted above, that Ms. Krasilnikova held title to the Crescent Avenue Property at the time, neither her name nor her signature appears anywhere on the First Generation loan documents. Indeed, Ms. Krasilnikova testified that she knew nothing about the First Generation loan, had never seen the loan documents, and that "there should have never been any mortgages like this" on the Crescent Avenue Property. *Id.* at 29. Ellen Malecki, for her part, testified that her and her husband's signatures on the loan document were authentic, but that she signed the document at Miller's request, without understanding its contents, and did not receive the proceeds of the loan. *Id.* at 124. The record does not reflect who, if anyone, made payments on this loan, or whether and when it was paid off. Indeed, on questioning by her counsel, Ms. Krasilnikova suggested that this mortgage was not properly recorded. *Id.* at 67-68. *But see* Gov't Exh. 30 (Release and Assignment of Rents referencing record date and number of the First Generation loan in the Recorder's Office of Cook County).

In any event, in late October of 2015, Ms. Krasilnikova herself took out a mortgage loan for $500,000 from FirstMerit Bank. The proceeds of that loan were used to pay off the Caliber loan. *Id.* at 68. It is unclear from the record—and the parties' briefs do not elucidate—who made the monthly payments on the FirstMerit mortgage or whether payments were made from Miller and Krasilnikova's joint

12

bank account. The FirstMerit mortgage was paid off with proceeds from the 2019 sale of the house. As Ms. Krasilnikova points out, she was the only seller identified in the sale documents, and there is no evidence of a cloud on her title to the property at the time of the sale.

III.

In Illinois, the term "owner" as applied to real property is understood in a realistic manner that may include "one who has the usufruct, control, or occupation of land with a claim of ownership, whether his interest be an absolute fee or a less estate." *People v. Chicago Title & Tr. Co.*, 389 N.E.2d 540, 544 (Ill. 1979) (quoting *Coombs v. People* 64 N.E. 1056, 1057(Ill. 1902)). Moreover, "[t]itle to property does not necessarily involve ownership of the property. Title refers only to a legal relationship to the land, while ownership is comparable to control and denotes an interest in the real estate other than that of holding title thereto." *Id*. Accordingly, "[w]hile title may be a factor in determining ownership it is not decisive. Of far greater importance is control of the property and the right to its benefits." *Id*. at 545. The evidence summarized above demonstrates amply that Miller satisfies this definition of "owner" with respect to the Crescent Avenue Property and belies Ms. Krasilnikova's claim of exclusive ownership.

First, while all agree that Ms. Krasilnikova made an initial investment of $250,000 of non-marital funds to acquire the Crescent

13

Avenue Property, the evidence shows that her investment gave rise to a 50% beneficial ownership interest, as she and Ellen Malecki were equal co-beneficiaries of that Countryside Trust that became the titular owner of the property. *See id*. ("In examining a land trust it is apparent that true ownership lies with the beneficiaries though title lies with the trustee."); Gov't Exh. 4 (transferring beneficial interest in Countryside Trust to Ellen Malecki and Ms. Krasilnikova as joint tenants). Accordingly, Ms. Krasilnikova was not the exclusive owner of the Crescent Avenue Property at the time of purchase. In addition, she formally relinquished any ownership rights deriving from her status as co-beneficiary of the Countryside Trust in November of 2013, when she transferred her interest in the trust to Ellen and Gary Malecki as joint tenants. Gov't Exh. 14. Although she remained an owner of the property under Illinois law, her ownership at that time derived from her conduct, i.e., that she lived in it with her family, made payments on the Carrington/Caliber mortgage, paid property taxes (which were escrowed under the terms of that mortgage agreement), and otherwise exercised control over the property—the very same conduct Miller engaged in during that period.

Equally importantly, the evidence shows that Ms. Krasilnikova did not act like the property's sole owner. Indeed, although she is a sophisticated financial professional with significant experience in the mortgage industry, Ms. Krasilnikova left it to Miller to

14

handle most of the transactions associated with ownership. When the Countryside Trust bought the property with funds Ms. Krasilnikova received from her family, Miller handled the closing. When the Countryside Trust took out a loan from SRK Ventures, Miller was the individual responsible for receiving all notices to the borrower, and he personally guaranteed the loan. And when a second loan secured by the Crescent Avenue Property was taken out to finance the construction of the new house and to repay the friend who paid off the SRK Ventures loan, Ms. Krasilnikova never saw the loan settlement statement and has "no idea" how the proceeds of that loan were spent. At a minimum, Miller and Krasilnikova shared responsibility for the transactions involved in the initial purchase of the property and the financing of the new house.

Moreover, it is undisputed that payments on at least the Carrington/Caliber mortgage were made with funds from the parties' joint checking account into which both spouses' paychecks were deposited. Accordingly, even assuming that the 50% beneficial interest Ms. Krasilnikova held in the Countryside Trust at the time she married Miller was non-marital property, the commingling of marital and non-marital funds to finance improvements to the Crescent Avenue Property transmuted that asset into marital property. *See Lee v. Lee*, 410 N.E.2d 1183, 1184 (1980) (where both spouses contributed to "the enhancement of the residence," there was "a commingling of marital property and non-marital property

15

which serves to transmute the entire property into marital property."), *aff'd sub nom. In re Marriage of Lee*, 87 Ill. 2d 64, 430 N.E.2d 1030 (Ill. 1981) (where an increase in property value is attributable to contributions by both parties, "the entire property is rebuttably presumed to be transmuted to marital property."); see also *In re Marriage of Smith*, 430 N.E.2d 364, 366 (1981) ("the payment of the mortgage with marital assets consisting of [husband's] income during the marriage...caused a commingling of marital and nonmarital assets and transmuted the entire property into marital property.). Ms. Krasilnikova's citation to *In re Marriage of Preston*, 402 N.E.2d 332, 338 (Ill. App. 1980), for the contrary argument is not persuasive as it pre-dates the Supreme Court of Illinois' decision in *Lee*.[3]

Ms. Krasilnikova appears to believe that the government is entitled to nothing unless it can quantify with precision the extent of Miller's financial contribution to improving the Crescent Avenue Property. But that is not the law. Illinois courts hold that once

---

[3] Ms. Krasilnikova's heavy reliance on her status as title-holder to establish her exclusive ownership of the Crescent Avenue Property is questionable for additional reasons. As the record shows, she did not become the property's titular owner until September of 2015, by which time she was married to Miller. Accordingly, to the extent she tethers her ownership to her status as titleholder, her cited authorities arguably support the classification of the Crescent Avenue Property as marital property, since she acquired title to it during her marriage. *See In re Marriage of Werries*, 247 Ill. App. 3d 639, 642, 616 N.E.2d 1379, 1383 (1993) ("[p]roperty acquired during the marriage is presumed to be marital property unless clear and convincing evidence establishes otherwise.").

property is classified as marital property, it must be distributed "in just proportions," and they consider a long list of factors to determine what divisions is equitable. *See* 750 Ill. Comp. Stat. Ann. 5/503. Moreover, it is Ms. Krasilnikova's burden, as an "interested person," to show that she is entitled to the full value of the property in which the government has established Miller's interest. She has not carried this burden.

In the end, the salmagundi of evidence the parties have submitted in an effort to show who paid for what to improve and maintain the Crescent Avenue Property—cancelled checks made out to contractors, redacted bank statements, payments among Miller, Krasilnikova, and an entity called "SNL Properties,"[4] and the like— serves only to underscore the extent of couple's efforts to obscure the money trail. All that can be said for certain is that the succession of transactions to finance improvements to the Crescent Avenue Property and to transfer its title during the period of Ms. Krasilnikova's ownership reflect a number of serious irregularities. These include, among others, the use of the Maleckis' credit history to obtain the Carrington mortgage; the unpapered $250,000 loan from Thomas Wake to pay off the SRK Ventures loan (and the equally unpapered satisfaction of that loan); and the removal of Ms. Krasilnikova as a beneficiary of the Countryside

---

[4] The parties' submissions do not discuss the ownership of this entity. Ellen Malecki testified at her deposition that Miller told her the name "SNL" stood for "Steve and Lillie." DN 164-1 at 35.

Trust, followed by the trust's putative conveyance of the home Miller and Krasilnikova shared with their children to the Maleckis. Two interpretations of this evidence emerge: either Ms. Krasilnikova was genuinely unaware of these aberrant transactions, in which case she cannot reasonably be said to have acted as the exclusive owner of the property; or she was an active participant in efforts to obscure the property's true ownership and the sources of funding to finance its improvement. In either case, she is not entitled to more than half of the proceeds of the 2019 sale.

IV.

For the foregoing reasons, Ms. Krasilnikova's motion for the release of monies held in escrow is denied, and the government's motion for turnover of the remaining funds held in escrow is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**

United States District Judge

Dated: August 31, 2021